Case No. 20-777, Joshua Atchley et al. Affelants v. AstraZeneca UK Limited et al. Mr. Branson, for the affelants, Ms. Glatt, for the affiliates. Good morning. I think the last time we were here on this case, we were not here. We were by Zoom, so it's nice to see you all in person. Thank you, Judge Pillard, and may it please the court, nearly three years ago, this panel upheld the complaint because it alleges plausibly... Wait, can you bring that up a little bit? I think it's at its maximum height, unfortunately. Can I lean forward maybe? Would that help? So nearly three years ago, this panel upheld the complaint because it alleges plausibly that the defendants paid bribes in cash and in kind to people they knew were terrorists. That stated a claim before Twitter, and it states a claim now. The rule from Twitter is that an aider-in-a-bedder's conduct must reveal conscious, voluntary, and culpable participation in a terrorist attack, and it instructs courts to apply a sliding-scale approach that balances three basic inputs, substantiality, scienter, and nexus. Across all three of those dimensions, this unusually detailed complaint is in another universe from the passive inaction claim that Twitter rejected. Now, for the defendants to come up with a liability rule that would exclude even this complaint, they have to transform Twitter's sliding-scale approach into a bright-line rule about terroristic intent and a strict nexus to each terrorist attack. That bright-line rule not only misreads Twitter and the common-law tradition that the Supreme Court invoked, but it also would gut the statute by extinguishing liability in virtually all cases involving terrorist financing. And if we know anything about the Anti-Terrorism Act, it's that Congress meant to curtail terrorist financing. By adopting an unrealistic legal rule, the defendants would thwart Congress's aim that it expressed in the text of the statute to impose the broadest possible basis, quote-unquote, for civil liability against those who give material support to terrorists. Can I ask you a question? Go ahead. Question. I'll ask both sides, but I'd like to hear what your answer is. One of the things that you both quote a lot and that the Court said in Twitter is, we're looking for the defendants consciously, voluntarily, and culpably to participate. What does culpability mean to you in this context, in the context of this case? I mean, you're both using it, freewheeling use, but that's not very helpful to me. I need to know what you have in mind, because I think it affects a lot how this case is to be decided. So, like much of Twitter, Judge Edwards, I don't think there's a bright-line rule that will tell you what is culpable and what is not in every case. You know this case as a story. So, in this case, I think there's two things that make the transactions culpable. What transactions? The transactions that the defendants executed with the Ministry of Health. And the first thing about them are the bribes that they paid to obtain the transactions. And we've emphasized this quite a lot in our brief, the corrupt structure of those payments. Let me follow up right here while it's in my head. If these were not bribes, would the case be decided the same way? It would be a closer case for sure, Judge Edwards.  Because the common law treats, to go to your culpability question, the common law views atypical transactions as more culpable under the law of aiding and abetting. That, in several of the cases I cited, the Camp case from the Eighth Circuit is a good example of that. The common law courts that Twitter relied on often look to, is this type of transaction routine or not? If it's routine, that doesn't mean the plaintiff loses, but that means that they have a higher standard under the sliding scale approach. So you know where this is going to take me now. I suspected that was your answer. Their response to you is, this is routine in dealing with these folks. People do bribe and they pay off, and that's just the way they do business. And so if you're saying it matters that there's bribery here to give us an understanding of what culpability means, their response should be, you can't rest on that because bribery is the way we do business, the way they do business. There's two answers to that, Judge Edwards. First is that you don't define whether conduct is routine by looking at how often does your counterparty do it. The common law looks to, is the conduct routine within traditional accepted common law principles of behavior? I'm just saying it's not within the relationship between these parties, within the relationship between the defendants and Judge Almaty in control of the health ministry, but across these types of transactions. That's correct. And I think, Judge Edwards, you're exactly right, Judge Pillard, I agree with that. Judge Edwards, if you took your logic too far, that would mean that you could avoid aiding and abetting liability by simply doing the conduct a lot. And I don't think that's the way the common law works. I think if it's across different transactions, so does anything in the complaint allege that the defendant's conduct of allegedly giving free goods and cash bribes to Judge Almaty to grow their market share are not the same treatment that pharmaceutical companies ordinarily give to clients? Well, certainly not in Iraq, Judge Pillard. I think we have alleged that free goods and cash bribes were unfortunately prevalent in Iraq, dating back to Oil for Food. And I would just note, Judge Pillard and Judge Edwards, to your question, this was prosecuted under Oil for Food, very similar conduct. But I'm asking a different question. We understand that this is, as in your alleging, that this is sort of the heir to the Oil for Food program and sort of gave them the idea of how they could siphon off some extra cash on what might be a legitimate, otherwise legitimate transaction. But that's the history of these parties. What I'm asking about is to the extent that Twitter emphasizes that the services that the platforms gave were given to billions of people in the same way, that they were neutral in that sense with respect to ISIS versus other users. I guess my question is, analogously, what's your response based on your complaint that it isn't sort of common practice for providers of medical goods in, you know, whether it's Gaza or Somalia or, you know, Libya to do this kind of conduct? Well, I'm not sure even the defendants would claim it is routine. We have not alleged in the complaint, Judge Pillard, what the prevalence of these practices are throughout the world. I certainly don't think it's standard practice for pharmaceutical companies to pay bribes in, let me give you an example, in France or in England. And I think the point, my answer to Judge Edwards was important because it's not just Judge Pillard that Oil for Food gave them the idea, but that this was a criminal scheme under Oil for Food. Johnson & Johnson entered a deferred prosecution agreement agreeing that they had acted illegally. That's at paragraphs 262 to 265 of the complaint. And it surely cannot be the conduct that is criminal in the United States counts as routine under the common law culpability test that we've been applying. But the other point, Judge Pillard, that I think is... Why is that so clear? Well, if you look at the common law cases, Judge Edwards... Is there some authority that says that? Because it's not intuitively correct to me. It sounds good, but I don't know. There are lots of practices in the world, many of which I find strange, but they're not impermissible in the places where they occur, and they may be impermissible in the United States. You're saying that as if it's just a given. That is not a given. Well, if it violates U.S. law... Okay, that's why I'm trying to understand what you mean by culpability. So now you're pinning it down. If it violates culpability, it's got to violate U.S. law. That's not the test, Judge Edwards. That is a factor here, and I certainly think that's sufficient. I'm not saying it's necessary. That's what I'm trying to figure out. But if you look at, for example, the Woods case and the Camp case, which are two of the civil aiding and abetting cases that we cited, they don't prescribe a formulaic test that says, here's how you know whether something is routine, and these are the three factors you look at. Courts do have to evaluate each case on their facts, and I think the criminal scheme that we articulated about oil for food is one very good indicator. The second very good indicator is, Judge Pillard, to your question, not all of the bribes here were even part of the standard practice with commodity. Paragraph 136 of the complaint alleges something called off-the-books payoffs. This court credited that allegation in its last opinion, and what was so pernicious about those is it wasn't part of the standard bid instructions. It was completely off-the-books, where Jay Shalmati comes and says, I want you to make a flat payment of free goods that circumvented inventory controls and gave them something to divert for terrorist ends. The third factor, Judge Edwards, I think you can look at here is the nexus to terrorism, and I take my friend's point that there will be types of culpability that don't move the needle on this inquiry, and they gave the example in the reply brief of an illegal gambling ring. If Pfizer had been running an illegal gambling ring in their scientific bureau in Iraq, hard to see how that moves the needle on the substantiality question, but here we've alleged at some length that the corrupt structure of the transactions turbocharged the contribution to terrorism, because by their very nature, bribes and free goods in this particular context were especially easy for Jay Shalmati to divert for terrorist aims, and I think that's why it is an important allegation here. It's because it does have that nexus to terrorism. Let's suppose that the facts that were alleged were instead that there weren't bribes and free goods that were provided, that it was generally known, reported in the press, government reports, etc., etc., that Jay Shalmati essentially pilfered 10% or more of the goods and sold them to fund their operations, and these defendants knew that. Why isn't that culpable, guilty knowledge? I think it is, Judge Wilkins. It's a closer case. That's what I was trying to tell Judge Edwards. I think that would still be a case that would satisfy the standard. It would be closer. Any time someone does business with an organization and it's known that that government entity has been partially captured or compromised by a terrorist organization to the tune of them reaping potentially millions of dollars from that business arrangement, there's culpability under the ATA. Where is this going? I think each case is going to turn on facts, Judge Wilkins, and this court has had three cases after Ashley, of course. It's had Bernhardt, Education for a Just Peace, and Ofici, and so I think there's not always going to be culpability if you transact with some entity that has a link to a terrorist group. Well, we know. Your defense was very compelling in Bernhardt. You know. My hypo, you know that essentially every dollar that you kind of give or dollar worth of goods that goes to the Ministry of Health, 10 cents of it is going to go to Jayash Omadi's coffers. That's a closer case. I think that's still safe to claim, Judge Wilkins, because of the knowledge you just posited, which I think is going to be rare. And it is telling. This court hasn't had a case like that since Ashley. People have tried. Bernhardt, Judge Pillard, and Judge Edwards, you probably remember Education for a Just Peace, where the plaintiffs came in and essentially tried to sue on Ms. Black's hypothetical about a nonprofit doing business in Gaza and providing lawful support. And there was some link to Hamas, and this court rejected the analogy to this case. But, Judge Wilkins, in your hypothetical, if you know that your transaction is directly benefiting terrorists, which I understand your hypothetical to pose, then yes, I do believe that poses culpability. Do you think that's consistent with the Supreme Court in Hamden? I do, and I think this goes back to Judge Pillard's question, which was she was asking me, how are what the pharmaceutical companies doing, how is that different from the social media companies? And, Judge Pillard, I don't think the key to the social media companies was simply that they offered their services to a lot of people. There were really three key things. One is there was no front-end screening by the social media companies. So there wasn't any sort of bespoke negotiation with a terrorist-controlled counterparty, which would be present in your hypothetical, Judge Wilkins. The second is there was no ongoing monitoring. The social media companies did not inspect ISIS accounts. In fact, in footnote 13 of the opinion, Twitter and Google and Facebook tried to take down the accounts. So there was not a sort of ongoing relationship in the sense that I think there would be in your hypothetical. And then the third thing was the lack of nexus in Twitter. And I just want to I want to focus on that because that was missing from your hypothetical, Judge Wilkins. I think it yes, your set of facts will show culpability, although I acknowledge it's a closer case. The corruption, in my opinion, makes this a much stronger case for us. But you do have to have a definable nexus to a terrorist act. And one way to read Bernhardt is that the conduct there was incredibly culpable. I don't think anybody disputed that. It was deliberate sanctions evasion by HSBC, helping terrorist-affiliated banks evade U.S. sanctions. But the problem for the plaintiffs was there was really no definable nexus to the Camp Chapman al-Qaeda attack in Afghanistan. And here, I think what distinguishes our nexus from cases like that is that there's really three factors you can look at. Geography, time and function. Suppose they had books. They kept accounts. All right. Same scenario, except they had kept accounts. This money coming from the defendants should be used for high living for our leaders, charitable activities for those who are harmed by war in our area and all this such thing. And there's another, they stupidly have books that say terrorist activities are paid for out of this account, not the money coming from the defendants. Does that make a difference? I think everything makes a difference, Judge Edwards, in the sense that this is a common law test. And I know it's definitely— I wish we were pushing the knowledge. And Twitter, of course, gives me some pause because it's taking a little heat, a little steam out of the knowledge piece of it. And you may know that you certainly can't be talking about a rule that if we support bad guys, then there's aiding and abetting, especially if you know they're bad guys. And there's no real connection between the support that you're giving and the bad stuff they're doing. That's why I'm trying to understand this culpability. You understand what I'm saying? I do. There's a mobster that has a cigar store. And you know they're mobsters, and they kill people. And you patronize a cigar store, and they live very well because of you. And they get really good cigars that they sell, but you're not intending to be in the business of killing. Does that matter? Yes, it matters, Judge Edwards. I agree that all of these facts that you're changing in your hypotheticals matter. But ultimately—let me address the two sets of books hypothetical from a few questions ago. I don't think ultimately that would negate culpability because money is fungible. And the point is—and this is something that this court has long rejected. Owens III did it, dating all the way back to the Kilbourn case in 2004. We don't require dollars to bonds. Because money is fungible and because of accounting artifice could eliminate the causal chain like you just posited. Now, I think it is significant, Judge Edwards, that that's not alleged here, that there was a discreet account. No, no, no. I'm just trying to understand. Yeah. And let me make a suggestion. I'm not surprised I'm getting these hypotheticals. But I do think that Twitter explicitly foreswore a bright-line rule. And it said, we want this area to develop through common-law adjudication in which every case is going to intensely turn on its facts. And so I do think the court can leave for another day these sorts of hypotheticals rather than trying to craft a rule. But I think that the way I read Twitter is that to the extent that you don't have sufficient proof of a nexus to a specific attack, then in order to be held liable on a systemic basis, the culpability needs to go up to something that approaches Pinkerton liability culpability in that they say association, but they mean association in the sense of not just you have some sort of friends or relationship, but association as far as association with purpose. And to Judge Edwards' questions, I mean, I'm surprised that you wouldn't say kind of categorically no with respect to the cigar store patron. Oh, but I'll come back to that then. I didn't get around to it. Just being candid with you, not playing poker here, at least I'm not. Some of your responses, especially to the hypothetical, somebody just knows that Jay Sharmati siphoning off dollars give me a lot of pause because I don't know how to write, how we write an opinion that's going to be true to what I think the Supreme Court was getting at with culpability wise. And it's not going to cause some of the problems that, you know, the government and amicus are worried about. So let me take those in order. I think the answer to the cigar hypothetical, I didn't get around to it, but I think it is a no. Judge Wilkins, let me address the Nexus issue first, because I think foreseeability is the touchstone of Nexus. And you're correct. You just, I think, gave a fair reading of the Supreme Court's second paragraph when it rejected the defendant's strict Nexus test about pervasive systemic and culpable relationship. I agree with that. But the first point on Nexus is that you don't require dollars to trace to bombs. You use a foreseeability rubric to decide if there is a definable Nexus. And here, these attacks were very closely tied to the assistance in really three ways, if I could quickly list them. Geography, time and function. So geography, there was a spatial proximity between the aid and the attacks. They all took place in Iraq. Sadr City was less than 10 miles from the Ministry of Health building. And I think this is not a case like Kaplan or like Owens III, where you have to trace a Nexus across halfway around the world. That's point one. The time point is easy. There's a complete temporal overlap between the aid and the attack. So we are not asking the court to draw a Nexus out in perpetuity. And function is one thing, Judge Wilkins, I hope will give you some comfort in writing this opinion, in that the Ministry of Health was awful. It was the nerve center operationally for Jaysh al-Mahdi's terrorist attacks in Iraq. And I really do think that element of culpability and Nexus distinguishes this case from certainly the charity hypotheticals that have been given. They are dealing with an entity that it's not just a financial pass through for terrorists. It is part of the terrorist's architecture for committing attacks. And, you know, to address, let me try one more time on your hypothetical that's giving you some pause about just goods being diverted. I think one way to conceive of that, and this is a hypothetical that was given at the Twitter argument by Justice Kagan, where she asked, let's say you're a bank and you're offering routine banking services. And Osama bin Laden walks into the bank and says, I'd like to open a checking account. I think we would all, Judge Edwards would agree that checking accounts are routine. There's nothing atypical about them standing in isolation, but they become culpable in light of the counterparty there. And here, for all the reasons that Your Honor explained in the last opinion, I think that's a fairly close analogy to this case and dealing directly with that counterparty, even if you eliminate the corruption, which is our lead theory, just to be clear. But but to address your hypothetical, I think that matters. And if you abstract away the counterpart and you just say it's just amorphously somebody is doing business in a country and 10 percent of the goods are making their way to Hamas or some terrorist organization, I think that is a much harder case than this one. Do we need allegations that or do you need in order to clear the Tom Hurdle allegations that the defendants knew of Hezbollah's reliance on special money to use the Ministry of Health resources that the defendants provided? I don't think so. Judge Pillar, that's that's the place where I part ways with the government's brief. I think if you look at the words in the statute, the knowledge element modifies the substantial assistance component of the inquiry, not the preceding plan or authorized element. The state of mind modifies the act. And that's something that the Supreme Court in Twitter, of course, not to really answer, but then does answer. It's not aiding organizations, aiding the ultimate act. That's correct. But the Supreme Court was clear that you don't need to know every facet of the primary actor's plan. And this goes back to my colloquy with Judge Wilkins about how foreseeability is really the nexus. I'm sorry, is the touchstone for nexus. So I think in defining that very element, Judge Pillar, the Supreme Court made clear, at least implicitly, that you don't need to know everything about the primary actor or what they're doing in order to have the requisite knowledge. And I postulate a hypothetical of let's take the most culpable conduct you can imagine. You give an IED to somebody you know is a terrorist and you know they're going to use the IED to go murder an American. I think quite plainly. Well, it's that second part that's not so straightforward. You know they're going to use this for a particular purpose. I mean, what is it you're assuming in your hypothetical? How do you know that? When you hand them the money, do they say we're going to go use this? Sure. In my hypothetical, yes. But doesn't it matter? It doesn't matter. You seem to be saying it really doesn't. It's just that you know this person is known to be and you know you're giving them a lot of money. That is correct. And that's what, at least I am wondering, does Twitter go that far? And when the Supreme Court says plaintiffs point to no act of encouraging, soliciting or advising the commission of the terrorist attack. That's a tough kind of standard depending on how you look at it. I can give you the money and just say have a good day, give you the money and say attack well. I agree with that, Judge Edwards. I don't think that was the legal rule, what you just read that the Supreme Court. No, no, I understand there's a lot of stuff. And I really think the civil cases are important to focus on because they do not have that sort of culpability in those cases. I think some of your questions today have been searching for. The Woods case is an excellent example from the 11th Circuit where the bank was held liable for aiding and abetting a fraud by its customer. The bank had no intent to further the fraud. The 11th Circuit said the bank had an improper motive, but that motive was to curry favor with the bank's corrupt customer. That is the very motive that we have alleged in this case. So I think that's how I would work through that language, Judge Edwards. But Judge Pillard, I was not using that hypothetical to give a test for assigning culpability. But it was just to show why in that hypothetical, of course, knowledge of that attacker's affiliation with Al-Qaeda, for example, wouldn't be necessary to hold them liable under this statute. So the defendants argue that Tomne makes clear that the general awareness that this court relied on in our now vacated opinion is inadequate, that conscious and culpable participation in the tortious action is what's required. So how do we show – I mean, maybe you've already answered this with your discussion of nexus. But if you just read Halberstam, the substantial participation on Linda Hamilton's part, ongoing, was one thing I think that the Supreme Court thought was important. Also, the unusualness of no money going out, she's keeping books, lots of things of value coming in. So she knows burglary. No hint that she knows or intends or even foresees, maybe, murder. Is your theory that – I guess – sorry, this is a bit rambling. So Twitter, the facts in Twitter itself are very attenuated nexus, passive, providing a good to all comers in the same way, nothing, as you say, bespoke. And then I take the court in a rather – with broad strokes to be defining a range of other circumstances going all the way to very substantial involvement so that effectively the defendant is responsible for all torts anywhere. I know you have kind of a fallback argument relying on that, that they're such substantial. But I take your argument to be more in the middle ground, your primary argument about how your complaint clears the Tom Ney hurdle. And part of – one of the factors there is whether, as with Linda Hamilton, the defendants here engaged in some wrongdoing, some intermediate wrongdoing, that then made it easier to show the culpability with respect to the ultimate wrongdoing. So she knew that there was burglary going on. That was part of what was sort of the culpability nexus to the ultimate murder. And then you cite here the material support statute. Can you flesh out the wrongdoing, the intermediate wrongdoing, as kind of more of a legal matter than a factual matter? I know you talk about the bribes and the free goods, so that we can understand why you're not going all the way to hand-in-glove activity such that the defendants are responsible for anything that Judge El-Mahdi or potentially Hezbollah does anywhere in the world. I think there's two theories, Judge Pillard, and this goes back to perhaps my unsatisfying colleague with Judge Edwards. The first is, as I said, the bribery and the corruption. And you asked me to articulate it as a legal matter. I think the way I would distinguish that sort of wrongdoing from the hypotheticals in my friend's replibrary is that the corruption had a nexus to the terrorism. There's a reason the Special Inspector General for Iraq Reconstruction called corruption in Iraq the second insurgency. That's at paragraph 172. It's because corrupt payments are ready-made for the terrorists to divert. A bribe is just by its nature. It goes to the individual rather than the institution, and it magnifies the link to terrorism. The same is true for free goods. I thought this court's last opinion well explained why that's true. I think the court understands the thesis that free goods bypass inventory controls and are easier to divert. So that's the lead theory. The second theory I was trying to give to Judge Wilkins is the culpability of the counterparty when you have an individually bespoke negotiated transaction. So this is not passive social media. This is active negotiations. I think that in and of itself gives rise to an inference of culpability here because there's two ways to view the very mushy culpability concept that Judge Edwards, you've been asking me about. One is how does the defendant themselves structure the conduct? The second is who is your counterparty? And I think in the context, and this is important, of an active negotiation that is individually bespoke, this is not a platform that is open to all comers, I think that second fact matters. And Judge Pillard, I think you fairly characterized my theories in your recitation about, yes, we do allege it's pervasive, systemic, and culpable. That is principally based on the Zobey case from Judge Ammon in the Eastern District of New York who I think got this opinion exactly right. But I don't think the court needs to go that far here. And one reason I think you know that is you just look at the Google section of the Twitter opinion in which that section addressed a funding claim, Judge Wilkins. So it was not a passive inaction claim. It was a funding claim. And when the Supreme Court got there, and this is pages 505 to 506 of the U.S. Reporter, it didn't invoke intent. It didn't invoke the common law principles, Judge Edwards, that we've been discussing. It just said the complaint didn't allege that the amount of money was meaningful. And that section of the opinion is really hard to make sense of if you credit the defendant's reading of Twitter writ large. Because, of course, Google already had an undisputed lack of intent to support ISIS. And I think the fundamental thing that's giving us trouble with some of these hypotheticals is that this is a sliding scale. So any time you change the input on one of these factors under Twitter, I think it affects the others. The final point I'd like to make on this, if I could, is that the line-drawing problems, and look, I acknowledge I'm not drawing perfect lines today. But the line-drawing problems in the other directions are worse. Because if you adopt this legal rule of specific intent and dollars-to-bombs nexus, which is what I understand the defendants to be arguing, it is going to gut this statute. And I am not aware of a case that has been litigated under the aiding and abetting provisions of this statute that would satisfy the legal rule that the defendants are attributing to Twitter. And I do not think it is a plausible reading of the Supreme Court's opinion to say we are effectively going to overrule every case that has ever let one of these claims go forward. I know you're sounding like wrapping up, but defendants say passive is in the eye of the beholder. They say we should read this complaint to allege that defendants ignored the ministry's alleged use of their medical goods, not that the defendants actively directed the products to terrorism. And I think it's easy to imagine that all things being equal, these defendants have zero interest in promoting terrorism. I don't think that's what the Supreme Court meant by active-passive, Judge Pillard. And you can just read, this is principally page 500 of the U.S. Reporter, the factors the Supreme Court looked at in defining active versus passive. First, it proceeded from the assumption that these are general communications platforms. And there, of course, is a long common law. The Brophy case is one. The GTE case from Judge Easterbrook in the Seventh Circuit is another. We've long viewed communications platforms a bit differently. But even leaving that aside, there's really three facets that I think I identified earlier. First, there was no front-end screening of the customers. It was a purely you set up the platform, and then the platform operator doesn't do anything else. People just sign up for the platform, and the algorithms work automatically. The second is there was no ongoing inspection of content. And that was really pivotal to the Supreme Court in that it wasn't monitoring ISIS's use of the platforms. It didn't have any sort of ongoing interaction with the customers. It was all mediated through the passive operation of technology. And then the third, Judge Pillard, goes to your point about the scale of the platforms, which was it served, I think the word was billions of users worldwide. And that is just not a credible analogy to bespoke pharmaceutical contracts that are being negotiated with this ministry because the defendants want to make more money to prop up their reference prices. And so I certainly I expect after Twitter that every defendant is now going to say my conduct is passive. Of course, that's a move they're going to make. Every bank is going to say what we did is passive. But if you look at those guideposts I just articulated, I don't think this is, not even close. But going back to, I think, earlier question by one of my colleagues, don't you at least have to allege that these contracts with the Ministry of Health were different than the types of contracts that these defendants negotiated and entered into with Ministries of Health for similar types of government entities in other countries? No, I don't agree with that, Judge Wilkins. And this goes back to a very early colloquy with Judge Edwards. I don't think you define routine by just asking how often does the defendant do it. That's not, I'm just saying it's not routine in the sense of this isn't the way we do it with anybody else. I mean, you haven't alleged that they have done business with this Ministry of Health any differently than they do with France's or Jamaica's or whomever's, right? We did not do a catalog in the complaint of the way they do business in other countries in the world. That's true. I doubt that is a disputed question. I don't think the defendant's position here is going to be we pay bribes in every market we operate in. Of course, that would be a huge criminal problem for them. So, I don't think this is really a disputed question, Judge Wilkins. Now, is it true that they paid similar bribes in other regions? It is. But, again, the question of routineness, as I read the common law, it doesn't hinge on that. And to go back to an early answer, there's two ways I think in which this was not routine. One is in this particular context, the corruption had an extremely tight nexus to terrorism. So, that is why we structured the complaint the way we did and spent so much detail alleging the bribes is because those magnify the causal link to terrorist attacks. So, that's one point. But the other point is that in this market, there's some things they did that were certainly not routine, even by the Ministry of Health's absurdly corrupt standards. The off-the-books payoffs allegation that I identified to Judge Pillard earlier is one example. But it can't be, I think, as this court looks at how do we define routine conduct under the common law, that it says conduct that one of these defendants entered a deferred prosecution agreement and effectively pleaded guilty to under Oil for Food is routine because they do it a lot. I mean, there are lots of law firms in town, and I've got lots of friends that have become very wealthy because this type of activity is very routine, and they have very robust FCPA practices. How does Foreign Corrupt Practices Act liability relate to what you're alleging? I don't remember. I know this was mentioned at least somewhere, either in the last briefs or this brief's relationship there. I think there is a relationship in that, the one that I posited to Judge Wilkins. Now, we're not attempting to prove a violation of the FCPA and all of its elements, but the principle of the FCPA… Why not? Well, first of all, there's obviously no civil cause of action under the FCPA, so that's one reason. I think one of the things you and I discussed, Judge Pillard, last time is that the statute of limitations also creates an issue with the FCPA. It doesn't go back as far as the Anti-Terrorism Act. But I don't want to confuse the inquiry in that I'm saying there is an identity of interest between the FCPA and the Anti-Terrorism Act, but Judge Wilkins, you're undoubtedly right. I have a lot of friends, too, that have bustling FCPA practices, but I think all of these questions are going to, does the word routine, does it describe purely the frequency with which it happens? Or does it describe something else under the common law of is this within the accepted norms of legitimate business activity? And it's really the latter point that I think the routineness inquiry is going to under the common law. And in that respect, I think that this case, if Judge Wilkins, if you don't want to answer your difficult hypothetical about an ordinary course transaction that removes the bribes, I don't think you have to, but I do think that for the reasons I said, even if you take it away, it would still state a claim. And the reason is the point I was trying to communicate, which is if you draw the line where the defendants are saying you should draw it, the Anti-Terrorism Act will not be able to fulfill Congress's purpose of interdicting terrorist financing as codified in the text of the statute. And virtually every case I'm aware of has involved corporations acting for profit in troubled regions where they give material support to terrorists to make a buck. And as this court has long pointed out, you typically can't trace fungible dollars to individual bonds. And so if that's the Supreme Court granted cert on that issue, I know in the Foreign Services Act area, and also they granted cert on that Estados Unidos Mexicanos case. What should we make of that? I mean, that's the home here. That case is obviously different. Judge Pillard, there's a strong Second Amendment overlay or feel you get to that case. I don't think merits briefing has happened yet, so it's a little hard to say how the merits briefing is going to take place in the Supreme Court. But it's a different statute, of course. I think the facts are different. And there is this notion, I believe. It's aiding and abetting liability. It is under a different statute, but it is. But I believe one of the things that the plaintiffs were asking for there was an injunction effectively trying to implement gun control in the United States to stop the flow of guns across the border. And that raises a host of issues I don't think you need to get into here. And one of the reasons is the answer I was just giving to Judge Wilkins, where you have here a specific cause of action that Congress codified. And it identified, Judge Wilkins, only one type of material support. Only one modality of material support is called out by name in the statute, and that is terrorist funding. That is Section 2A.3 of JASTA. And that, I think, should give us great pause to read Twitter in a way that would say every decision that has ever allowed a terrorist funding case to go forward was wrongly decided. I don't think the Supreme Court was going that far, nor did they need to, because that theory in Twitter was just miles apart from this one. It was passive inaction for all the reasons that I've explained. You cite in your reply read for page 9 for the notion that helping Jaish-al-Mahdi collect money was itself criminal, 18 U.S.C., 2339A, little a, and 2339C, little a1. Those statutes, why those statutes? What work are they doing here? So the work those were doing was attempting to answer Judge Wilkins' question about nexus. So the question with nexus, in our view, foreseeability is the touchstone. And, again, one of the reasons the Supreme Court says the word foreseeable seven times in its opinion. But the question is foreseeable from what? And if you want to draw, Judge Tillard, a precise analogy to Halberstam, which perhaps we're not doing anymore, but that's the reason I did it. Because there, the principal crime being aided was Bernard Welch's burglaries. And what this court did, what Judge Wald did, was she said that the murder was foreseeable from the burglaries. And so if you want to adopt that same rubric here and hew tightly to that formulation, the equivalent of the burglary is Jaish-al-Mahdi's violation of those criminal statutes raising money for terrorism. And we have cited Owens III and Boehm for the proposition that these terrorist attacks are foreseeable from that. I don't think you need to go there. Why not? Because given the court in Tomnay saying, you know, foreseeability in those circumstances wasn't enough. I'm just trying to understand your middle range theory, you know, not going all the way to every terrorism tort that Jaish-al-Mahdi commits and not going all the way to passive, neutral. So just one clarification on your question. I don't think the Supreme Court said that there was foreseeability in Twitter. I don't think that the Rhina nightclub attack was a foreseeable consequence of what the platforms were doing. So I would push back on that premise. But I do take your broader point, Judge Pillard, and I think it goes back to the three answers I gave to Judge Wilkins, which was this is not a case where our theory is anytime you give a dollar to terrorists, you're liable for any attack anywhere in the world. That's not the theory. There's geography, there's time, and there's function here that really make this theory of nexus much tighter than in the cases that I don't understand my friends to be quarreling with, like the Kaplan case in the Second Circuit. I remember discussing that with you, Judge Edwards, three years ago. The nexus in Kaplan was much more attenuated than the nexus here. It involved payments in Lebanon that stretched across sovereign borders from a nominal Hezbollah charity front to Hezbollah and then into Israel to cause a rocket attack. And there was no direct showing of nexus there. So I think those three factors really limit this case in a way that we're not susceptible to the criticism that Twitter leveled. And one of the reasons, Judge Tillard, is that Jaysh al-Mahdi, it's not the same sort of terrorist group as ISIS. And this is one point I think is worth stressing. It doesn't have ambitions to build a global caliphate where it may well attack somebody in East Asia because it's trying to expand its caliphate. It was a localized insurgent terrorist group whose founding mission was to kill Americans who drive them out of Iraq. So by the very nature of the group we're dealing with here, I think the nexus is already tighter than the nexus in Twitter. And, Judge Tillard, I think the middle ground formulation you're using is exactly right. We are not saying that any time you give culpable support to a terrorist group, you're on the hook for anything that group does anywhere in the world for all time. And I think the court should not go that far. I don't think this court ever has gone that far because foreseeability, of course, is a well-established tort principle in the law. This court has decades of experience administering it in terrorist funding cases. And it is a broad concept, to be sure, but it's not limitless. And, Judge Wilkins, I know I've mentioned this case several times today, but the Bernhardt case is a great example, I think, notwithstanding your dissent. But if you take the majority opinion as the law of the circuit, that's a case I think that the court can still put on the other side of the line. And that, to me, gives this case less of a feel of opening the floodgates because we know we've had three years with this opinion already and Pandora's box is not open. So I think the court can adhere to many of those same distinctions when it writes the opinion here. But in doing so, it will avoid the worst problem that my friends have in the other direction, which is if you ratchet up the line to where they want, this statute is not really doing anything. And I take their position to be that I should tell my families that I represent that they should go file a pointless lawsuit against Muqtada al-Sadr. And that's what the Anti-Terrorism Act was designed to stop. Does knowing mean the same thing in 2333A, I'm sorry, D, 2, the baiting and abetting statute? Is that the same knowing as the knowing in providing material support to terrorist statute 2339A? Is there any daylight between what knowing means in those two statutes? I don't, after Twitter, Your Honor, I think if I recall the knowing element of 2339A. So there obviously is a difference with 2339B, but that wasn't your question. With A, I believe the knowing is pretty specific textually in that you have to know the material support will be used for essentially a terrorist attack. Corroboration, carrying out violation of laundry list of statutes, essentially a terrorist attack. I think the standard in Twitter is not quite that strict. And one of the things that I think the Supreme Court preserved in the nexus discussion was that a defendant's knowledge does not need to extend to every part of the primary actors plan. And so I don't think it's the rule. Certainly not. I think this was even disclaimed by the defendants in Twitter that you have to know, for example, who the target is. And I certainly don't think it's knowledge that your individual dollar you've given will be traced to a specific IFP or a specific EFP, I should say. But what I do think, Judge Wilkins, is that this is a sliding scale under Twitter. And the Supreme Court was pretty clear about that, that scienter and substantiality work in tandem. And so the more substantial the aid, the less knowledge you need, the less substantial the aid, the more knowledge you need. That is also a case that comes straight from the camp case in the Eighth Circuit. If that's the case, then going back to my hypo, and 10 percent or more of the goods are siphoned off by Jay Shomadi and sold to the tune of tens of millions of dollars, that's pretty substantial aid. Then on your sliding scale, then knowledge can be a lot less. So you know that that's happening. Maybe you don't want it to happen in that sense. It's not guilty knowledge, but you know that it's happening. So why isn't there liability? Well, Judge Wilkins, I— You said yes, there is. Maybe that's the answer. That has been my answer today. I'd acknowledge it's a closer case, obviously, and the court doesn't need to go that far. But that's the reason why I've said yes, there is. Now, I think Twitter is clear, Judge Wilkins, in your formulation that we don't judge substantiality just by how much it is. This goes back to Judge Edwards' question about culpability. That is one of the lessons from Twitter. And so in your hypothetical, the aid is less substantial than what we've alleged here, even if it involved the same quantity of goods, because I think the culpability is somewhat less. So I'm not sure I would agree— I thought that your point about what they said about Google was that because there was no allegation that it was a substantial amount of money, then, you know, that precluded liability for them, and they didn't even really have to reach state of mind. I agree with that. And I think—well, I'm not sure that they didn't have to reach state of mind, but that was the ground they chose to dismiss it on. And I'm not saying Judge Wilkins— That's on the revenue-sharing. Correct, on the revenue-sharing piece. Or the notion of bespoke or specific— Arguably— Specific contract. Less bespoke than we have here, but yes. Not entirely passive and standard per billion. Yes, exactly. Judge Wilkins, I didn't mean to suggest that the amount of money is irrelevant. That's not what I was saying. But what I was saying is there's other things you look at, too. And this is one of the reasons that these hypotheticals are so different is because this sliding-scale test, you need to know a lot of facts to know how to weigh the various factors. And my point was if you just tell me the amount of money alone, that certainly bears on the substantiality inquiry. I'm not contesting that, of course. And we've alleged many millions of dollars a year here. But you need to know more than that. And the reason I think your hypothetical is closer, although I think it still does state a claim, is because those other features of substantiality are less present in that case than they are in our case. I have to say, just as a court, we apply the standards that are in the law. And there's a lot of balls in the air here with the statutory language, Halberstam, three elements that are incorporated, the six factors in Halberstam that the court now tells us to view more holistically. And then along comes nexus. I mean, nexus is sort of, it's a new thing. I mean, it's in the common law, so it's an old thing. But how do we understand the relationship of, I mean, you've said this, but the relationship of nexus to the factors that, I mean, I don't think we ever talked about it before. Right, I don't think the word was used in the briefing in the Supreme Court in Twitter, except in the government's brief. So is it replacing something? Is it overarching? Is it a gestalt? I mean, how do we really get that right? I think it's the, as I said in my opening, I think there's three inputs into the sliding scale. Substantiality and scienter, which we focus on a lot. I think nexus is the third. And your question, Judge Pillard, is one of the reasons the hypotheticals are hard and why I keep giving perhaps the unsatisfying answer that the Supreme Court said we're not going to prescribe right-line rules, that we want common law adjudication on the facts. It's not just about how we work with it, but more about, like, where does it come from? And I think it comes from the text, according to the Supreme Court, and the Supreme Court declined to resolve the syntactical dispute about whether the object of the assistance needed to be the individual act or the person committing the act. But as I read the Supreme Court's opinion, they're saying this is a tort law concept, and in torts you have to aid individual acts. And here the individual act is the act of international terrorism. So I credit all that. I think that is true. I don't think, though, Judge Pillard, that that requires that significant of a change to your last analysis here, because, of course, the court was looking at aid to the individual attacks. The question is just how do you get there? And for the defendants, what they are doing here, I think, is they are reproposing the strict nexus test that the defense bar proposed in Twitter and that the Supreme Court directly said no to. So the question is, now that we've established that there does need to be a definable nexus, I think that is the word that the Supreme Court used in saying what it thought Twitter lacked, how do we trace that nexus? And if it doesn't have to be individual dollars to individual bonds, which it can't be. They didn't use the term nexus, but you're saying effectively, they were asking? Yeah. I mean, the line from Justice Thomas's opinion, I would start with Judge Pillard, is neither side is quite correct. And then they reject the plaintiff's theory of nexus, which was completely unlimited. But then they go to what I understand the test that may not have used the word nexus, but it was the same test, that you have to trace the literal act of assistance to the specific attack at issue in some sort of one-to-one way. And the Supreme Court said no to that. And I think that's really the rub. And as I read the opinion, Justice Thomas and the unanimous court had two reasons that strict nexus test was flawed. The second of the two is what Judge Wilkins, you asked me about with the near common enterprise and pervasive systemic and culpable. Judge Pillard, what you characterized is my fallback theory. That's the second, but the first reason that the strict nexus test failed is because it didn't give any role for foreseeability in the analysis. And I think that is the court's north star in terms of how it should apply nexus here. And the reason I came back to the sliding scale, Judge Pillard, is I think it's not an on-off switch on nexus. I think the Supreme Court was pretty clear that the more nexus you have, the less you need on the other two. And conversely, the less you have, the more you need. And so I'm not going to be able, I don't think, to give you like a clear line that says in every case, this nexus is good, this nexus is bad. But here, the important point is this is not the Twitter theory. This is not you did something to aid a terrorist group and you're liable with really no other argument for everything they did for all time. And the problem with the plaintiff's theory legally was they didn't even make an argument, I don't think, trying to trace the nexus to the Ryanite nightclub attack. They made a legal argument that says we don't ask you because instead you're aiding the enterprise. And the court said, no, no, no, that's not good enough. You have to at least try to trace a nexus to the individual act. But in here, I think I've explained why the court should be able to do that. Morning. The morning may please the court Lisa black for the defendants. My sound. Okay. Tom requires that he wants to push it down into that. Well, if you're good, I'm good. Tom requires that each defendant consciously and culpably participated in each attack in such a way as to make those specific attacks succeed. The other side talks about it has two axes and we agree it works in tandem on a sliding scale. But I think we have very different definitions of what those axes are. The first is culpability with respect to terrorism and not just culpability. And the second is a nexus between the defendant's aid and the actual specific attacks injuring the plaintiffs. And we agree when there's a higher showing on one axis, a lesser showing is required on the other. But Tom is a demanding standard and it requires at least some of both to ensure that aiding and abetting liability extends to only those defendants who are blameworthy participants in these specific attacks. This court previously held that it was enough that the defendants allegedly knew of a link between their alleged corrupt provision of cash and free goods and Josh almighty's operations. Although we strongly deny those allegations, they are simply not enough under Tom under either access. For the U.S., pre Tomna thought that this complaint was sufficient. After Tomna they said, this is Supreme Court, Tomna did not support or approve imposing liability just because a plaintiff can identify an atypical transaction with an organization affiliated with terrorists. So I want to start with Nexus where we're obviously our strongest. The complaint nowhere alleges that any defendant, much less all defendants, aided any attack on any plaintiff, much less all of the attacks. Tomna holds that it is not enough, as the other side spent, I don't know, an hour saying, that defendant gives substantial assistance to a transcended enterprise. It's exactly what he said his middle ground was. It's enough if you aid Josh almighty. He has to abet the commission of the act of international terrorism. Now, Josh almighty had way too many sources of other funding and spent its money on way too many other things, including violent operations, to conclude that any defendant, and there are 21 of them here, contributed to any specific attack on the plaintiff. At paragraphs 172 and 173, the complaint says that this ministry took in $2 billion in total corrupt payments. And as the complaint elsewhere in this panel's opinion pointed out, that each defendant allegedly only gave several million in aid. And the complaint in paragraphs 1362 and 351 alleged that Josh almighty engaged in countless attacks on Iraqi citizens that don't involve plaintiffs. Again, this panel's opinion talked about the murdering innocent Iraqi civilians and their enemies, in addition to Americans. So, it's not enough that they say it happened in the same country around the same time. That's just not a nexus. It's just not. At a minimum, any nexus would be so attenuated, as I think Judge Wilkins said, you would have to have a high showing on the intent axes. So, when you say that there's no definable nexus, and that between your client's contributions to Josh almighty and any specific attack injuring any plaintiff, I thought the Supreme Court disavowed necessarily you would have to have specific intent to injure the plaintiff, and that seems to flow from Halberstam. Well, there are two examples where the nexus could be excused, and that's the pervasive and systemic. So, if you're basically that blurs with conspiracy liability and Pinkerton liability, but if you are at one with the terrorist, then yes, you're liable for each and every act. And Linda Hamilton was a conspirator. She was so invested in her boyfriend's burglary that she assisted each and every burglary and the foreseeable torts carried out. The other example, which I think the other side placed heavily reliance on the court and Tom decided the grim case, and that's talking about when you carry out tend to carry out one torch, you are liable for perceivable towards that further the original toward. And in that case, the example is some boys broken to a church, and they lit a match to see their way through that set the church on fire and the burglars reliable for the fire. But here, of course, there's no allegations that these, how does the, the building burning down further? The original tort of breaking the fire, starting the fire, the breaking in lighting the match to see they couldn't see it was at night. So, they let them around the first one further. The second, sorry, the lighting the match furthered the burglary. Lighting the match was one of the means of the burglary. Just didn't it cause a second. So, sure. When he killed the victim. So, you're, I think your friend on the other side would say, well, the giving of the money to the irregular, as they alleged giving up the money to special money furthers the attacks on their client. Right, but it has to be reversed. They'd have to show the terrorism was done in furtherance of the bribery, which obviously wasn't using them. How the fire, the ultimate harm in Graham is furthering the original more limited in furtherance of it's part of the bribery. Hamilton is the best. You didn't have to murder him to steal the goods, but it was still part of the, you know, in order to get out the victim got in the way and he murdered him in order to get out of the church. They needed to see they lit a fire. You know, the other side can't be right because they basically saying any dollar given to that makes its way into terrorist hands foreseeably. That's not really what they're saying. Now, they're saying in a much more sort of case specific way, you know, whether they're right or wrong about it. But I'd be interested in your response. They're saying this was Iraq specific. It was widely reported that this ministry was not a legitimate government agencies overrun by terrorists. They were using it at the headquarters that they were diverting, you know, whatever they could get their hands. But with all due respect, that's different from any dollar that falls into. Yeah, that just but you're bleeding into culpability. There's still no Nexus. You can talk to a blue in the face how much they were. There is a place. Both of you have places to point to Supreme Court. That's what's making so difficult. You're ignoring the place, which makes you at your side very vulnerable. Supreme Court said we can't rule out the possibility that some set of allegations involving a to a known terrorist group would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts. I mean, that is clearly refuting what you're overstating. The Supreme Court was not buying your position. The problem for us is there's a whole lot of middle ground here on both from both sides. I mean, I can find ways to understand what your opponent is saying, and I can find ways to understand what you're saying. But I can see the counter on both sides. And this is the critical passage for you. I think that's the worst language, the critical passage in the opinion. I think it's at the end where explains that you either have to have high intent, a high Nexus or pervasive and systemic. And the other side, their middle ground is just nowhere. It basically says all you need is foreseeability. The Supreme Court is saying we're not ruling out situations involving a set of allegations involving a to a known terrorist group that would justify holding the secondary defendant liable for all of the group's actions. Yes, and I think that the examples we're talking about are only two. Linda Halverson's where she's basically a co-conspirator and is fairly said to aid and abet each and every burglary that her boyfriend carried out. And the other example is the morphine case. The Supreme Court case is called direct sales. And that morphine distribution case, which the court is citing, I think, around that same passage. The defendant actually was aligned with the illegal distributors objectives and that both of them were profiting from illegal distribution. Same way with Linda Hamilton. In other words, the terrorist and the alleged aid and better had aligned motives. And here's I think you recognize early on in your questions. They're completely disparate. No matter how bad of people these procurement officials were. And, yes, they were affiliated with a violent militia, but they're still procurement officials. And these are still bribes to alleged bribes to get mammograms, antidepressants and cancer, cancer prevention or cancer curing drugs into the lives of Iraqis. And that's just not instruments of terrorism. It's not morphine distribution. And it's certainly not Linda Hamilton. And you just cannot divorce this case from the common sense reality that I think the government did change its position and said this is whether or not you want to call them illegitimate or legitimate. It is a procurement department that is giving drugs both to they're stealing drugs and giving them to Josh Almighty, but they're also giving them to the Iraqi people. And these are 21 medical companies that in no way could be said to share the objectives. I'll put it this way. The drug companies didn't profit the more Josh Almighty killed people. They profited the more mammogram machines that were being sold and the more birth control that was being sold and the more chemo drugs that were being sold. What does culpability mean to you? Culpability means to me culpability with respect to terrorism. And I think that's where they misalign it. They say, well, culpability means and I have to call out this opinion said twice that these were illegal bribes without citation. The complaint on page 179 disavows any intent to show they were illegal. So at most the complaint says this is corruption and they're commercially unreasonable terms. And you can call that culpable. You can even call it illegal. Illegal under what? I don't know. He didn't answer. You asked him what it violated. He disclaimed, I think, honestly, that it was he will not and cannot. Why does it have to violate the law? If the theory of the liability is you're essentially giving over additional free goods off the books, knowing that it's going to be sold in the proceeds provided to cash. Oh, my. Why isn't that? So it's certainly knowledge and you could call it culpable knowledge, but it's not sufficient. Culpable knowledge with respect to terrorism because the bribery of the officials is not to help Josh Almighty's violent objective succeed. It's to help get drugs into the hands of Iraqi people to be sure with knowledge that these drugs, you know, imputed knowledge. Sorry. Isn't that true of Linda Hamilton? We disavowed any notion that she had an intent for Welsh to go out and murder anyone. She just wanted to make money and live a good life with him. And she was doing. Oh, no, she wanted him to burglarize. Right. Right. She was doing. She's gone up that far. And so here it's like, OK. The defendants clearly didn't want them to do anything other than buy their drugs. Didn't want them to do. I shared zero, zero, any illegal objectives with Josh Almighty. Obviously, according to their allegations, the bribery and the giving of the free goods, they say, which has nothing to do with support, is giving currency that they know is going to hit the black market and enrich that somebody. And this is something that they have to do in order to be the ones who get this segment of business. No, the only way. Yes, that there's knowledge. The difference is critical between Linda Hamilton and the drug, the morphine distributor, and that the profit motive was completely aligned with the terrorist motives. The only way for either Linda Hamilton or the morphine distributor to profit was the illegal conduct by the wrongdoer. We profited only because they bought drugs. We didn't profit because they were out killing people. In other words, there was just there's a complete mismatch and a disconnect between how culpable, whether or not it's illegal, that you're bad, you're corrupt, you're willing to bribe. Again, these are obviously deny the allegations. But the allegation is we really wanted these contracts. But there's nothing that says, like the doctor and the morphine and Linda Hamilton, I'm going to do everything I can to help my husband, excuse me, live in partner, rip everyone off, break into their homes. And the morphine distributor, the Supreme Court held, you had an intent to share the intent to sell the drugs. I'm going to look the other way at burglary. But then it's a foreseeable risk of burglary. So it's enough there that once she's in for the penny, then they say, even though we were willing in that opinion to assume that she had no intention, she wasn't aligned with him on murdering. It's a foreseeable risk. Help me out here. So if it's unlawful for your clients to bribe an entity that they know is run by terrorists, and you may think the allegations that it's other than government officials aren't adequate, but just for the purposes of hypothetical. If they've adequately alleged that this is not legitimate government contracting officials, or if they're also known to be terrorists, and they're being bribed, not just given goods at fair market value, which I think is their theory. Then I guess the question is, is that not an illegal either bribe or material support to terrorists? And if so, then don't we get into the Halberstam framework, where if that's substantial, if the nexus is tight, then they're also in for the foreseeable risk. No. That that money is diverted to do the very thing that Josh Almighty exists to do, which is kill Americans and drive them out of their homes. No, because not only is there no intent to further Josh Almighty's violent objectives, no even alleged intent, there's still no nexus. And in the Hamilton case, you have pervasive and systemic and intentional assistance. It would be no different if they were giving them whiskey, or some other automotive manufacturers were saying, let's go out and hire prostitutes. I'll bribe you that way. It's just disconnected. It's wrongdoing, and surely it violates the laws in the Middle East to give them alcohol and cigarettes, and maybe they knew that the alcohol and cigarettes were going to be sold on the black market, but that still doesn't get you a nexus. It doesn't even argue a nexus. All that gets you is exactly what the Supreme Court said is not enough. It's not enough to just give money to the organization. You have to tie it to the attack. And we still just, the only way to get around that is pervasive and systemic.  I mean, they're saying, I think that their primary claim is that they're responsible for what Josh Almighty is doing, as they put it, down the street, but not necessarily for anything anywhere in the world. So their primary theory is not that they're really tantamount to co-conspirators, but that the nexus was so close, factually, in terms of- No, the court did not think as long as you murder someone in the same country around the same time period, that's enough. If ISIS had just been limited, I guess there it was Turkey, but if the attack had been limited to wherever ISIS, I don't know, was headed out of, or if Hamas just is committed in, I guess Hamas is other places too, but just in Gaza. That can't be right. Even Gaza is a big place, and there's a lot of attacks going on. So it can't just be that if there was a government in Gaza that you gave a bribe and that some attack down the line made its way into Hamas, even if you knew it, that that's enough for each and every attack. Because the only way to accept their view, you want to call it a fallback, the extreme position is that these will be liable for each and every attack carried out by Josh Almighty in Iraq during 2004 through 2013. Or they say and beyond. There's no in-between. They say, well, this would render the statute a dead letter. That's just not true. In the 9-11 case, which I think was the instigator for this, the financing, you don't have to show dollars to dollars, but Saudi Arabia, you have to show a link to the specific attackers or the specific attacks. And Saudi Arabia financed the training camps where the hijackers went, and they gave a certain large check to the al-Qaeda. At the very same time, al-Qaeda cut the check to the mastermind. Which case are you referring to? It's the famous Saudi Arabia case out of, I think it's Ashton, out of Southern District in New York. It's the 9-11 complaint that the victims of 9-11 filed, and Congress was upset because there was no secondary liability. And in the October 7th cases that are now being filed in Iran, there are statements about how involved Iran was with the attack on October 7th. It's not just you were giving money to Hamas and Hezbollah. It's you knew about October 7th. Maybe you didn't know the particulars, which place they were going to kill or how many people. But there was a lot of evidence that links the assistance to the attack that was going to happen on Israel. Obviously, you don't have to know the certain states. Isn't it foreseeable that your money might be used to attack Americans when there's death to America flags all over the facility? We're not fighting foreseeability for that reason, and this court already said it was foreseeable. I do think foreseeability was the same issue that was raised in the Twitter case. It was obviously foreseeable that ISIS was running all its propaganda training, recruitment, fundraising videos off YouTube. Yes, it was foreseeable, but foreseeability is not enough. Foreseeability is not enough in the facts of the Twitter case with the attenuated nexus there. I guess I'm interested in to the extent that if we set aside the passive provision of goods in the same way to billions of people, which we had in Twitter, and that's mainly what that case illuminates. Let's say we bracket for the moment the notion of can't amount to conspiracy. Really hand in glove with the direct source users. We're talking about something in between. To take off from Twitter, let's say that you run an electronic billboard company and you erect billboards in wherever ISIS is fighting and that have ISIS recruitment tags on them. It seems to me that would really bolster the nexus. I think it bolsters culpability. It's not clear it would bolster the nexus at all unless they tie it to a specific attack. Come join ISIS? That's not a nexus. It's just not. But if they say right there on the street, come join ISIS, and you know that everyone who joins is going to increase the probability that the mission of ISIS is going to be carried out as a core part of the mission of ISIS. I think that this is completely ignoring all. I think it's part four of the opinion. The court said five times the focus has to remain on the act of international terrorism. I do think Tomnett, maybe not be a sea change, but it is a big change. I think it's his court recognized in Amazon. It goes back to a conceptual core. There is a nexus requirement. And to say that just ‑‑ I just keep reading the sentence. It's not enough to give substantial assistance to a transcendent enterprise floating above and over and above the commission of the act of international terrorism that injures the plane. Let's look at the facts here, which are that you're saying that you're not really disputing foreseeability. And here you have a situation where Josh and Marty is active right essentially down the street, right where Americans are, right during this time. This insurgency is a problem in killing Americans right during that time. So why isn't it that sufficient enough to be ‑‑ to meet the nexus test with respect to ‑‑ we may not be able to ‑‑ may not have been kind of nexus and foreseeable with respect to these particular attacks, but that some attacks on Americans are likely to result by this group that you are providing funding to. I think this goes a little bit also to the U.S. brief, too, in that the problem with this argument is that any aid in any war‑torn country, and this is what the charity brief is saying, if it's foreseeable that it could lead to an attack, that's the substitute for the specific nexus to the act of terrorism. And you're basically saying do not enter any war‑torn country if the organization has any ties with bad guys. The U.S. was giving millions of aids, and I think the government's brief cites the court of appeals appendix page 686, it's the best site for that, and says it gave $300 million to build out the capacity of the ministry and delivered seven truckloads of medical supplies and medicine. That's not terroristic aid. It's just not. And it's not tied to an attack. It doesn't matter how many ‑‑ I suppose if you had evidence that the terrorist took the drugs off that truckload and then converted them to cash and then there was some indication that it was supposed to be used for an attack, but when you have zero, zero intent with respect to an attack and zero factual nexus to an attack, it cannot be foreseeability. Or you just might as well wipe the nexus requirement. But that support wasn't in the form of a bribe or something that was essentially outside the scope of what was going to be aid to civilians. Yeah, totally fair point that the government, but to me more direct was that you could say it was worse. At least we were trying to sell something. The U.S. was just handing it over in a truck and saying here's money, and they may have put safeguards, but ours was actually selling medical supplies to a government that was giving some of its drugs to people that were dying in the Civil War, even though obviously there's the allegations of extreme corruption. But again, if it's just foreseeability, I'm not sure the bribe turns on it. Nothing in their theory then turns on the bribes. It's just, oh, well, you did something bad, and the fact that your bribe, i.e., the commissions and the rebates, or your aid, you knew it was being stolen or siphoned off. I mean, the $2 billion to complaint sites is theft. And this court's opinion talked about it, too. They took general revenue stream, they took the hospitals, they took the ambulances, used them for death squads to kill Iraqi civilians. So I just think, again, we're back to what the panel opinion said. It would be enough just to have general awareness and foreseeability. And, yeah, if you don't think Tomna changes that, then we're in trouble. But I do think Tomna resets the clock on how the court was thinking about aiding and abetting. You seem to be, I don't know if I'm hearing you correctly, in stating your theory, it's almost like the thesis that comes from IGBAL. There's an obvious alternative explanation here, i.e., they want to make money. Then the burden becomes tougher on those who are trying to get into court under IGBAL. I mean, that's almost what you seem to be arguing. Because, obviously, making money is completely consistent with ATA life. No, no, no, I'm understanding. And you're saying that is the obvious alternative explanation to a foreseeability claim. The foreseeability, this is so foreseeable. And you're saying, no, but there's an obvious alternative explanation. You can't refute it. I see. Well, yes, I was just saying, I think it's fair that the Linda Hamilton had a profit motive. And it's fair to say that the morphine distributors, they were acting at a profit. They were still aiding and abetting the principal tort because they shared. An obvious alternative explanation. Oh, yes, yes, yes. Thank you. That took me a minute. Yes. You with me now? Oh, yeah. Yeah, I missed that one big time. I'm trying to understand. There was no other explanation for what Linda Hamilton was doing. No other explanation for what that morphine distributor was other than to aid and abet the principal tort. Here, there is not only an obvious explanation. It is so glaring that drug companies are not trying to aid terrorism that it's almost embarrassing. I feel sorry for the other sides, the families, but not the plaintiff's lawyers bringing this case. This is the wrong defendants. This is to even call them direct liability case direct. They're actually terrorists. That's an allegation in this case that this court upheld that they were terrorists carrying out direct directly causing the attacks. And I pulled that. I think we rejected one theory and a plan. No further. Okay. Fair. Fair. But in terms of where we're sitting, Justice Pillard, this is because these facts are so bad. It is that highlights just how outrageous we see these complaints are on our reputation. And one other thing I want to say about the Middle East, not that we go around bribing people, but paragraphs 118 does allege that this form of bribery was popular throughout the Middle East. We don't think it's bribery. Obviously, we think especially the free goods or rebates that occur in the United States, but we obviously contest the bribery allegations. But I think that was why the other side got a little cagey when asked about this happened anywhere else, because there is that allegation on 118. It does say this is just popular, popular form of bribery. But back to stepping out in terms of common sense about foreseeability. On that point, you do argue in your brief that what the plaintiffs call bribes and say is unusual, the valuable giving of resellable free goods. You characterize that as government-mandated discounts. Is there an allegation in the complaint that says these are government-mandated discounts? I think there are 22 allegations that say the government required them as a condition of doing business, just like Saddam Hussein did before and just like the government did after. So we know that this was the only way to get drugs into Iraq was to pay the commissions and pay the bribes. Those allegations are, well, I guess the U.S. brief at 18.19 says that they were required as part of the service, and they're at our brief. All right, that's a good number. Yeah, there's a lot of paragraphs. In our brief, sorry, 14 through 15, or maybe it's 18 through 19. Is that the U.S. brief or your brief? Our brief cites how many times that they say they were standard and required. I don't think there's any dispute. This I know for sure. The whole theory of the complaint is we had to pay the bribes. The only reason the bribes were being paid is because we wanted to be in Iraq selling for this market. Now, again, we obviously deny the allegations, but there's no question that as the only way to get drugs into the country, and this gets back to your alternative explanation, the only way Western medicine was going to get into Iraq was these drug companies showing up. And we do feel strongly that if you affirm, you put up a giant sign that says do not enter ever any country that's got needs humanitarian assistance that's going to be war-torn, because there usually is, certainly Middle East, but maybe even other countries, there's usually, where there's civil war, there's bad people doing business with the government. And I get it that here it's an extreme takeover and there's the death squads and all that, but I think the government's brief here is really helpful. And it says these were standard conditions and express contracts with the ministry in service of the ministry's legitimate purpose. The United States actively supported that same ministry and encouraged private companies to do the same. You say that the defendants interacted only with ministry officials, not Hezbollah, but the plaintiffs allege in minute detail that they did interact with Jaysh al-Mahdi, and that Jaysh al-Mahdi was openly and notoriously running the ministry and was known to be a Hezbollah proxy. It's accurate that the complaint alleges that every Jaysh al-Mahdi official that the companies dealt with was a ministry official. So it's just another way of saying yes, we were actively engaged with doing business with ministry officials who were also Jaysh al-Mahdi officials. So there's no question that Jaysh al-Mahdi, we're not saying it hadn't infiltrated, but there's also no question that we're doing, the only reason we're there is to do business with the ministry in its official capacity. And that's, I think that's where I know we cite the 22 places in the complaint that are specific. I do think just to be fair to your honor, there was one allegation that came up in the complaint that dealt with a straight alleged bribe by just one of the defendants at a restaurant that doesn't relate to a government official. But that's one transaction out of, you know, five corporate families, 21 defendants. But all the other allegations are in connection with ministry officials who also are in the, you know, they're in the political wing, badly elected, and then they're also violent militia people. The government brief could have easily said, right, affirmed a dismissal and taken a position on that, right? I'm sorry, the government this time around, post-Omni? Yeah, but they didn't. Absolutely. So what should we take of that? Oh, it's government. I mean, I think it's typical government. I think the government said they were very much against and said that this case was to post for child for aiding and abetting liability, or at least close to it, five times in the oral argument. And then after Tomna did, not an about face, but it, you know, I'd say at least 160, 170 degrees and came pretty far saying you got to take another look. Now, it didn't say, because it says a couple of times, you just need to go back and relook at it. But it says foreseeability is not the test. It said we encourage these companies. We there were supporting, and it said these were legitimate programs. And I think it also said, you know, that there is something to be said for the proxy by proxy, that we're in there doing business with a government that's a proxy for Josh Ahmadi. Josh Ahmadi is a proxy for Hezbollah, who's the actual foreign designated terrorist organization. And all that's just a piece. I don't think it's so much on nexus, but it's certainly a piece on culpability. It is very different than saying, walking up to a designated terrorist and saying, here's aid. I mean, there is a material support statute that is, you know, is there for no nexus requirement. If you give an aid to a terrorist, you go to jail, and that's a statute. And ATA is about, you know, it's an actual tort. You have to have the nexus and the requisite culpability. It seems like a lot of the citations to Twitter in your briefing really equate the allegations of what the defendants here did with the allegations of what the platforms. Yeah, and that's obviously not correct. I mean, it just feels like it's shoehorning something different. It doesn't help us analytically. Well, Judge Pellett, I do think the fact that Tomna was a super easy, almost frivolous case doesn't make this a hard case. But there's no question that Tomna was a joke of an ATA case. There was no allegation that anyone from ISIS even used these videos that carried out the attacks. So it was, you know, a 9-0 frivolous case. But the court still spent 13 pages saying, we're going to kind of rein in Halberstam and get it back to this conceptual core. Instead of talking about six factors, we're going to talk about the two and pervasive and systemic. And it kept saying over and over and over, you have to consciously and culpably participate in the attack in such a way as to make the attack succeed. But the consciously and culpably really shifts depending on the now all-important nexus. And mental state. I think both. Well, nexus, and then they talk about the mental state and the substantiality. But just the degree of those two things in combination changing depending on the nexus. Yeah, but just in just Amazon, this case, the court just said that lack of an intent, terrorist intent, carries significant weight. But Amazon, like Twitter, is a case of passively providing a uniform service to all comers in the same way. Yes. And this is not that case. Yes. What I'm saying is I think Amazon is wholly consistent with Twitter, but doesn't shed much more light. And this is so what you're saying here is. Oh, I think it shows light. It is difficult in the same way that I found your brief difficult, which is that if there's no nexus, then the combined and sort of. Mutually, you know, with one's greater, the other could be less. The idea of of substantiality and say enter the total of those has to be greater where you have the attenuated nexus. If you have more nexus than the whole analysis of what's provided by substantiality and say enter less work to do. And then you have to have less distance to cover kind of percent after a hundred percent. But there's no way you're going to convince me that this complaint doesn't allege enough under either, because you have to at least take into account. There's absolutely no terrorist intent, no way, no habit. And then you don't always you don't have to have a great intent. You have to have say enter and I take the court to be saying that where there's a closer nexus, it would be enough to participate in something substantially with the court with the and have it be with the awareness. Yeah, I'm trying to I'm trying to get out the rest of the Senate. There's no specific intent and at the end, there's no nexus either. There's no strict nexus. So they don't have a very strong showing on either axis. And I don't think they have much in the middle. There's no nexus. Absolutely zero nexus to any attack. There's a nexus to Josh Almighty's violent operations in the main, which all could have been to been killing their enemies and Sunnis. There is not a single and this complaint was written before Tom and I just think it shows they did. They wrote this complaint without Tom in mind that you think the nexus here is as to an attack lacking as the nexus in Twitter is I find not possible. And, and it's not really it's different than thing. Okay. It's different than Tom that to be sure because there's no allegation that Isis was using the platforms to be sure. There's no they weren't in the court points out plans never alleged that Isis use defendants platforms to plan or coordinate the rain attack. That's right. And there's a legend. You ever even use Facebook or YouTube, whereas we know Josh Almighty spent the money not on these attacks. You know, Josh Almighty is as at least as alleged. It's mission in the world is to kill. But now we're just now we're just talking global on Isis. I read that the sentence you just read Isis was Isis was all over YouTube and and Facebook and Twitter. There was just no allegation that any of the attackers on the rain and nightclub ever used those services. It has to be the specific attacks on Americans in your view, no matter whether they're closer nexus or not. There's no, no, no, there's zero nexus. The only way they can get around it is with pervasive and systemic or they don't have to trace dollars for bombs. But there's a way to get, you know, just like the, they'd have to look at the bank accounts who were doing these attacks. Were there cells? I mean, the at least 9-11 money was going to the specific cell at Isis that carry or Al-Qaeda rather, excuse me. Sorry for saying Isis carried out 9-11 Al-Qaeda have to trace dollars for bombs. That seems pretty clear. So what do what is the showing if funds are being given to the attackers? Yes, or for the attacks, the attackers, the attackers, i.e. the names of the attackers or the cell or the actual attacks. Yes. And if someone if they had earmarked it or said purpose, you would have an easy case. But when they say that it's a dead letter, the plaintiff should not be bringing cases unless they've got a nexus. You say the attacks, the attackers or the cell. I'm not sure. Well, if it was a well, in other words, the hijackers for 9-11, if there was, you know, whatever, there were 11 or nine. If it was just for those hijackers, they don't have to know their exact names. I mean, again, when you have. How would that be proved when you're talking about money other than with some kind of like the 9-11 complaints? Saudi Arabia was giving money to the training camps where they trained and gave money at a civic check. That was, I think, 400,000 and then 300,000 went the next week to the mastermind. But they don't try to do that here. So, yes, you can write an opinion that on a different complaint, if it was ever filed or if they tried to amend that said, here's we're going to try to prove that somehow. And again, there are 21 defendants here. They don't even try to lump anyone's money to any attack. They just say you gave money and there were some attacks and we know they all happened in the same country around the same five year period. That's clearly not enough under Tomna. It's just not no question. Tomna is a much easier case on all the prongs because Tomna was a very easy case. And the weakest thing you think about it is what? The weakest thing in this case? Yeah. Well, lack of nexus. And then we have the best thing going for us is there's no allegations that the culpability was aligned with the terrorist, the terrorist intent. But there's no question we're the strongest on just nexus. But we do think we're very strong with the context of, again, common sense. These are drug companies that are there providing life saving their entire they wake up every day to save lives, not in the hopes that their drugs will be used to kill people. The Supreme Court cited favorably U.S. decision written by Judge Leonard and. And then the only. But the counterfeit case. Yeah. The only possessed counterfeit bills and he sells them to person a with the knowledge that they're going to sell them further to someone else. Person B will call. And so the question is, is there criminal criminal aiding and abetting liability of person B's possession? And Second Circuit says no, but they say if this had been a civil case, there would be. Oh, I thought it might be different. I wasn't sure it said it would it would be liable. It said if this were a civil case, that would be true. An innocent buyer from the first person. Could sue pay only and get judgment against him for his loss. Actually, an innocent buyer from from the second person. So so he only gives it to person a they sell them to person B. And then they say if this were a civil case where person B had had transferred the counterfeit drugs to to some innocent buyer, that innocent buyer kind of two steps removed could recover. On an aiding and abetting fear, because civil is different criminal. And so kind of knowledge and natural consequence there is foreseeability, et cetera, is sufficient to both be the substantial assistance and or the culpable. Yeah, so just I would say a couple of things. The first is, you know, the Supreme Court mixed and matched a lot of criminal and civil and then said, but we're not going to talk about today how much the civil has to overlap with criminal. So, obviously, it's not citing that part of the Second Circuit's opinion, but more to the point direct. Are you saying Second Circuit got it wrong? No, because I'm about to get my second point, which is at least that's counterfeit. And I think this does go to the morphing distributor where there's no alternative explanation. What's he doing counterfeiting? Here, there's a lot of good, innocent explanations for what the companies were doing in Iraq in the middle of the Civil War. It gets, in other words, it's a mismatch of culpability. You can't just take the fact that these were unreasonable transactions or corrupt in the sense that they wanted to grow their market share and somehow equate that to the type of tort that the counterfeiter was talking about. But what other purpose is there for providing, you know, missions, free goods that you know are going to be sold other than to put money in the coffers of Jashomash? To put drugs in the hands of Iraqi women and children. Iraq would not have Western medicine unless they were there. Iraq doesn't have its own drug company. You could just say we're going to provide it, but we're not going to provide you with any of the free stuff. And the complaint alleges Six Ways to Sunday that that was not an option. It says you could not, that's why the bribes were given. The bribes were given for the sole purpose of getting the contract. I mean, there's no allegation that we could have negotiated the level of bribes down. That's the pre-Saddam stuff. But this was required by Saddam before them. And then, you know, they said this is popular in the Middle East, but and it continued after Jashomash left the scene. So it's just a, it's a, now, again, I agree that it can't just be, well, everyone's doing it or it just was routine. But just the context of this is a country that needs drugs or medicine and x-ray machines and EKGs. That's the only way to get them. And you just I don't think the other side disputes. There would be no medical Western medicine in Iraq, but for these drug companies being there and the bribes and commissions being paid a complaint, just complain is completely inconsistent with that. Thank you. I'll start with the last point. It's a great illustration of why this court should not draw factual inferences on a motion to dismiss. It is not true that the only way for Western medicine to get into this country was by them paying bribes and commissions to Iraq's Ministry of Health. We allege at paragraph 76 and 113 of the complaint that there were alternate procurement mechanisms available. The U.S. government in the sources Ms. Black cited was not selling to the ministry. The U.S. government was running its own procurement process for this reason, because selling medicine to the Jashomash-controlled Ministry of Health was the worst conceivable way to get drugs to anybody who needed them. Their conduct, as we allege in the complaint, made Iraq's health care structure worse, not better. And they did not do it, certainly not on a motion to dismiss, because they were trying to save Iraqi lives. They did it because they wanted to profit. That is why they paid the bribes. This is at paragraph 139 of the complaint. They were willing to go along with it because it jacked up their reference prices and they made more money than they would have had they worked with what the U.S. government was doing, which was trying to clean up Iraq's health care system, not make it worse like they did. Second point is that Ms. Black's theory of nexus would overrule essentially every case that has addressed in aiding and abetting theory under the Anti-Terrorism Act. And Judge Edwards, I think what's really notable about it is that there was no mention of Judge Pierce's Kaplan opinion in the Second Circuit. That opinion was wrongly decided under Ms. Black's theory of nexus. The nexus theory there was much more attenuated than what we have here. And indeed, the nexus theory I just heard her articulate is more demanding than what courts require for proximate cause. Under Owens III, which is this court's canonical proximate cause case in a material support of terrorism case, there wouldn't be a quote unquote nexus because Sudan gave support to al-Qaeda in Sudan and this court held that it proximately caused both foreseeability and substantial factor. Al-Qaeda attacks two countries over in Tanzania and Kenya. And that is one of the real problems here. And I didn't hear a real answer other than Ms. Black identified two cases that she claims would satisfy the nexus test. Let's address them both. Ashton, I'm not exactly sure what the case site was. Before you get in there, you've mentioned Kaplan, you've mentioned Owens, and you say a whole body of cases would fall under her theory that have recognized aiding and abetting liability. Are there any others you'd want us to consider? Zobay, for sure, Judge Pillard. I think Judge Ammon's analysis of Twitter was very correct and persuasive. And, yes, there may be some words you could change here or there. But her analysis of the nexus question from Twitter, this is a post-Twitter opinion, was quite compelling. King and Bonacasa are two others. And I think it is notable. Are there like three Twitter court of appeals cases where aiding and abetting possibly would be on the chopping block? It's just Kaplan, Judge Pillard. You may remember this from our last appeal when you decided actually there had only been two. There had been Gonzalez and there had been Kaplan. Now, Honickman from the Second Circuit dismissed the claims, but we agree with its legal reasoning. I take it under Ms. Black's formulation that case was also wrongly decided. Their theory would take a sledgehammer to essentially every case that has been decided under the Anti-Terrorism Act. And on the two cases she identified, Ashton and the cases against Iran for October 7th. Okay, the latter is an easy one to explain. That is exactly what they are asking us to do. I agree. Iran is going to default in that case. It's going to be a lawsuit under the Foreign Sovereign Immunities Act, not the Anti-Terrorism Act. And they're going to get a default judgment that is not worth anything. That is, I think, the rubric they are trying to put us in. They want us to go sue Muqtada al-Sadr, a pointless lawsuit that would accomplish nothing. My clients would certainly find it cold comfort. The Ashton case, I'm not exactly sure if that caption is correct. But the case against Saudi Arabia is also not brought under 2333 D2. It is another FSIA case that is about a waiver of sovereign immunity. And if you look at the text of the Anti-Terrorism Act, Saudi Arabia is immune under Section 23372. So I think it is telling. And I can't stress this point enough. There are no realistic cases that surmount the rule that you just heard from the defendants for the last hour. And I think that is a very compelling reason that you should reject it. Third, on whether foreseeability is enough, Judge Wilkins, I agree with you on your read of Peone. I think Peone did draw a civil criminal distinction. However, that is not the test we're proposing here. We're not saying that every time something is foreseeable from your conduct, you're liable for it. You have to meet substantial assistance and knowledge. And that, I think, was the factor that was missing from Ms. Blatt's parade of horribles. Does it have to be an alignment of interest between the defendant and the secondary wrongdoer? No, there does not have to be an alignment of interest. No alignment of interest whatsoever? If by alignment of interest, you mean shared intent? Both of you are going, sometimes you're close, sometimes you're not. But it seems to me that's not an insignificant question. And there's something in the Supreme Court's opinion, and I can't find it, that suggests that you have a strong case in aiding and abetting when there is what I'm calling an alignment of interest. Definitely. I agree with that. All right. So if you have to have an alignment of interest, what are the aligned interests in this case? So I don't think you have to have it. The one thing we know in foreseeability is you can lose easily if it's not foreseeable. The opposite is not true. It is not clear that you have winning cases merely because what we're looking at is foreseeable. That is absolutely not the case. I agree with that, Judge. Okay. So that causes me to wonder. I thought there had to be aligned interests, and you just not guessed it. No, I shook my head no. I didn't mean to change my mind. I was conveying no. It doesn't matter whether there are any aligned interests between the, you know, take this cigar shop again. I mean, no aligned interests whatsoever, but I foreseeably know the money is going to be used for bad things. Hereafter, show something more in these cases. Must there be an alignment of some interest where there's something that suggests that the defendants, defendants of a sort, like in this case, it's in their interest to do this other than an obvious alternative explanation, which is permissible. They're entitled to go make money. They're entitled to put drugs in the world market. That's okay. But not by bribing terrorists, Judge Everson. I think for you the key thing, that makes their interests aligned because they're bribing terrorists? No, I think that's confusing two things. I do not want to answer your question by saying it doesn't matter. Of course it matters. I think intent plays into the calculus, but it's not necessary. No, I'm not going to let you put me in the box of intent because this isn't an intent. If you have it, you're clearly going to win or lose depending on which side you're on. But it's something other than that. So taking that, I had understood your question to be suggesting shared intent. That's what I had understood alignment of interest to be. If that's not what you mean, then I think you look at the culpability standards that I explained in my opening argument here. They clearly were profiting off of Jay Shalmati's control of the ministry. And the Woods case from the 11th Circuit, Judge Edwards, I think is our best case on this. And it was cited in Twitter approvingly. And there, the bank, I suppose you could say they had an alignment of interests with the corrupt principal tortfeasor in that the bank wanted to keep them as a customer. But the critical distinction, when I heard Ms. Blatt talk about state of mind, she's focused on intent. And there was no intent in Woods. And I think that is telling that the defendants have not cited a single civil case from the common law requiring intent. Not a single one. But Tom, when they talk about peony, they say that the age-old formulation of aiding and abetting, at least in the criminal context, is that the defendant participate in the action as in something that he wishes to bring about, that he seek by his action to make it succeed. And then they say similar concepts or narrowing principles are present in tort law. And that is like, you look at any aiding and abetting jury instruction, both civil and criminal, that formulation of participate in something as if you wish it to come about or to make it succeed, it's there. That's important what I'm talking about. I'm trying to drill down on Judge Edwards' point. So maybe that's not intent per se, but that's just basically semantics at this point. It's intent or knowledge or culpability by another name. It's something that you associated with yourself because you want it to succeed or the purpose is to help it to succeed. So I think that's a good gloss on Judge Edwards' question. And the unity of interest here, if you're not defining it as intent to cause terrorism, is I think what I just described. It's similar to the unity of interest in Woods, where these companies profited from their direct relationship with Jay Shalmani. And there was a lot of factual argument about how all they wanted to do was help Iraqis. I've addressed that. I agree, Judge Edwards, that a profit motive in and of itself is not going to create liability. But the statute, I think, sweeps broadly than that. And if you're acting out of profit and you enter a relationship with terrorists where you are culpably assisting what they're doing, the fact that you're doing it for money is not a get-out-of-jail-free card. So you're saying the unity of interest is that both the companies and the defendant companies and Jay Shalmani want to deal with and profit from dealing with one another? Yeah, I think that's right. And we've alleged this, paragraph 139 of the complaint. There's a reason they did these deals as opposed to working exclusively through the U.S. government-led contracting process. And this notion, Ms. Blatt asserted, that the U.S. government just dropped truckloads of stuff with the ministry and didn't follow it or audit it is just inaccurate. And that's another indication of why we need discovery. But, Judge Pillard, I think that's right, that it was a unity of they wanted to curry favor with the Jay Shalmani terrorists that ran the Ministry of Health. That was the unity, Judge Edwards, in your formulation that I think is enough. And, yes, they may not have had specific intent for Americans to die. We don't allege that. But that's really not required under the civil tradition of aiding and abetting. What if we say that we believe that culpable knowledge requires that the defendants participated in the action as in something that they wished to bring about and that they sought by their actions to make it succeed? We say that that's the culpability standard. Do you need it, and how? I think it depends, Judge Wilkins, on how you're reading the word wish to bring about. The word wish, I think, is the key to that formulation. And if the test is, if by that you mean intent to cause the principal tort, the terrorist attacks, to succeed, there's a common law notion. We litigated this last time we were in front of this court, that the common law presumptively treats people as intending the natural consequences of their actions in civil cases. And it's the restatement principle that was litigated in the direct liability portion of our last brief. So that's how I would suggest we could meet that standard. I don't think, though, Judge Wilkins, that that's the standard. I understand you were reading from Twitter, and that is one of many different formulations the Supreme Court used. But that has never been the rule for civil aiding and abetting. You're telling me that if I go out and look at standardized civil jury instructions, I can in two minutes pull one up, that I'm not going to find that language? I can't make that representation to you, Judge Wilkins. I have not looked at the civil jury instruction for aiding and abetting cases. What I can say is that Twitter didn't cite a civil case adopting that rule. It cited two cases that reject it in Woods and Camp. The defendants have not cited such a case, and I have not seen a case applying a specific intent standard. And the Camp case, Judge Wilkins, which Twitter cited four times approvingly, it sets the sliding scale of culpability at knowledge. And the very end of the opinion, I think, is telling, because it says that we will require intent, but only in one narrow circumstance, when the theory of assistance is premised on an omission, on silence. And that is, I thought Judge Pillard hit the nail on the head in her understanding of our reading of Twitter. If our theory was passive non-seasons, I think there's a very good argument that under the Supreme Court's opinion that we would need to show the type of intent you just postulated. But I do not think that that has been the rule in the civil case, and notwithstanding that I haven't done a survey of jury instructions, the cases cited in these briefs and in Twitter itself suggest the opposite. And the quote you read from Peone, I thought was quite telling, and I pointed this out in my reply brief, but the government has long read Peone for this exact distinction, dating all the way back to its amicus brief in Bellum. And so I think we could meet that standard, Judge Wilkins, but I do not believe that is the test that applies in a case like this that involves active misconduct. The final point I wanted to make is just on the limiting principle of our theory. I've addressed how they have no limiting principle on their end, and they are essentially asking the court to all but write this statute out of the U.S. Code. But on our test, Judge Edwards, we are not just saying that foreseeability is enough. I agree with you that it's a broad concept. But that is not what we're saying, that any time you take an action in the world and it's foreseeable, that's going to create liability. You have to have knowledge, and you have to have substantial assistance that considers all of the factors we've talked about today. And I just think here the arguments about the bribery prove way too much, because we have alleged in excruciating detail in the complaint how the bribery had a nexus to the terrorism and helped the terrorists do what they wanted to do. And if that's not enough, then it's hard to conceive of an aiding and abetting case that would ever be brought, and I think I've made that point. Ms. Blatt said you really sort of pull away from claiming that any of the bribes were illegal, any of the conduct of giving free goods is in any way unlawful. That's inaccurate. We have an entire first section of our complaint addressing oil for food that ends with paragraph 53 that addresses how these similar payments were both criminally and civilly prosecuted under oil for food. And we have alleged that this scheme was a continuation of that. And I would just note that oil for food was not something innocuous. These companies were bribing Saddam Hussein, a sworn enemy of America. So this idea that this case is somehow a bridge too far, that they would never cross that moral rubicon, we know that's inaccurate. And so we've alleged in the complaint, Judge Pillard, that this was a continuation of that same FCPA violative conduct. What Ms. Blatt quoted was paragraph 179 of the complaint where we said that our theory is not limited to FCPA violations. And that is very true. That is the hypothetical that Judge Wilkins, you and I spent a long time discussing this morning. That's what that sentence means. We're not disclaiming an allegation that these bribes violated the FCPA. Of course they did, as alleged. And so I'm glad you raised that, Judge Pillard. I think that's inaccurate. All right. Yes. Thank you. Thank you both. The case is submitted.
judges: Pillard; Pillard; Wilkins; Wilkins; Edwards; Edwards